**Missing Case Number:**
**24-1577**

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIRST CIRCUIT

```
--------------------------------x
                                :
DANIEL CARPENTER                :
                                :
        Petitioner,             :
                                :
        v.                      :
                                :
UNITED STATES                   :
                                :
        Respondent.             :
--------------------------------x
```

---

## APPLICATION FOR CERTIFICATE OF APPEALABILITY AND AN ORDER TO VACATE CONVICTION PURSUANT 28 U.S.C. § 2106

---

District Court Case No. 1:04-10029-GAO

Dated: June 12, 2024

/s/ Daniel E. Carpenter
Daniel E. Carpenter
Petitioner *pro se*
18 Pond Side Lane
West Simsbury, CT 06092.
860-573-7770

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..................................................................... ii

INTRODUCTION ...................................................................................1

I.    STANDARD OF REVIEW.............................................................3

II.   THE SUPREME COURT'S DECISION IN *SMITH v. UNITED STATES* REQUIRES THIS COURT TO VACATE PETITIONER'S CONVICTION FOR VIOLATIONS OF THE VICINAGE CLAUSE.................................................................................12

III.  THE SUPREME COURT'S DECISION IN *SMITH* IN REGARDS TO THE VICINAGE CLAUSE REQUIRES THAT THIS COURT GRANT THIS MOTION AND VACATE PETITIONER'S CONVICTION PURSUANT TO 28 U.S.C. § 2106 ...................................15

    A.   The Constitutional Right to Be Tried in a Proper Venue Is Foundational to the Anglo-American Legal Tradition .......................17

    B.   The Vicinage Clause Has Its Roots in English Common Law and The Magna Carta ........................................................19

    C.   The American Revolution Underscored the Importance of the Right to Proper Venue and a Local Jury, Which the Founders Codified in the Constitution ................................................21

    D.   Post-Founding Jurisprudence Has Embraced and Reinforced the Vicinage Clause.............................................................29

    E.   Vacating an Unlawful Conviction Vindicates the Historical Purposes of the Right to be Tried by a Jury from the Proper Vicinage.................................................................................36

IV.  PRAYER FOR RELIEF .......................................................40

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Barefoot v. Estelle,*
    463 U.S. 880 (1983)...................................................................3, 5

*Bousley v. United States,*
    523 U.S. 614 (1998)............................................................ 5, 7, 10

*Davis v. United States,*
    417 U.S. 333 (1974)............................................................ 7, 8, 10

*Duncan v. Louisiana,*
    391 U.S. 145 (1968).................................................................35-36

*Felker v. Turpin,*
    518 U.S. 651 (1996)........................................................................7

*Ferrara v. United States,*
    456 F.3d 278 (1st Cir. 2006) ........................................................2

*Green v. United States,*
    335 U.S. 184 (1957)......................................................................38

*Griffith v. Kentucky,*
    479 U.S. 314 (1987)....................................................................6-7

*James v. Walsh,*
    308 F.3d 162 (2d Cir. 2002) ........................................................8

*Johnson v. Wynder,*
    408 Fed. Appx. 616 (3d Cir. 2010) ............................................9

*Lawrence on Behalf of Lawrence v. Chater,*
    516 U.S. 163 (1996).....................................................................16

*Marbury v. Madison,*
    5 U.S. (1 Cranch) 137 (1803) .....................................................37

*McCleskey v. Zant,*
    499 U.S. 467 (1991)................................................................ 7, 10

*Miller-El v. Cockrell,*
    537 U.S. 322 (2003)................................................................ 3, 5, 6

*Panetti v. Quarterman,*
    551 U.S. 930 (2007)..................................................8, 9

*Ramos v. Louisiana,*
    140 S. Ct. 1390 (2020)....................................................35

*Ring v. Arizona,*
    536 U.S. 584 (2002)..........................................................2

*Saffle v. Parks,*
    494 U.S. 484 (1990)................................................2, 7, 10

*Sanders v. United States,*
    373 U.S. 1 (1963)..............................................................8

*Schriro v. Summerlin,*
    542 U.S. 348 (2004)................................................*passim*

*Seabrooks v. United States,*
    32 F.4th 1375 (11th Cir. 2022)........................................5

*Slack v. McDaniel,*
    529 U.S. 473 (2000)......................................................3, 5

*Smith v. United States,*
    143 S. Ct. 1594 (2023)............................................*passim*

*Stewart v. Martinez-Villareal,*
    523 U.S. 637 (1998)..........................................................9

*Stewart v. United States,*
    646 F.3d 856 (11th Cir. 2011)........................................9

*Teague v. Lane,*
    489 U.S. 288 (1989)....................................................7, 10

*Travis v. United States,*
    364 U.S. 631 (1961)........................................30, 31, 35

*United States v. Abdelaziz,*
    68 F.4th 1 (1st Cir. 2023)..........................................2, 12

*United States v. Arrington,*
    763 F.3d 17 (D.C. Cir. 2014)........................................16

*United States v. Auernheimer,*
    748 F.3d 525 (3d Cir. 2014)....................................29, 31

*United States v. Becker,*
502 F.3d 122 (2d Cir. 2007) ............................................................8

*United States v. Brennan,*
183 F.3d 139 (2d Cir. 1999) ..........................................................30

*United States v. Buenrostro,*
638 F.3d 720 (9th Cir. 2011) ...........................................................9

*United States v. Cabrales,*
524 U.S. 1 (1998) ............................................................ 29, 30, 35

*United States v. Carpenter,*
494 F.3d 13 (1st Cir. 2007) .............................................................2

*United States v. Coplan,*
703 F.3d 46 (2d Cir. 2012) ............................................................35

*United States v. Cores,*
356 U.S. 405 (1958) ......................................................................30

*United States v. DiFrancesco,*
449 U.S. 117 (1980) ......................................................................38

*United States v. Glenn,*
828 F.2d 855 (1st Cir. 1987) .........................................................30

*United States v. Johnson,*
323 U.S. 273 (1944) ................................................................ 35, 37

*United States v. Lopez,*
577 F.3d 1053 (9th Cir. 2009) .........................................................9

*United States v. Medina-Ramos,*
834 F.2d 874 (10th Cir. 1987) .......................................................35

*United States v. Morgan,*
393 F.3d 192 (D.C. Cir. 2004) .......................................................35

*United States v. Palma-Ruedas,*
121 F.3d 841 (3d Cir. 1997) ..........................................................37

*United States v. Passodelis,*
615 F.2d 975 (3d Cir. 1980) .............................................. 18, 30, 36

*United States v. Rodriguez-Moreno,*
526 U.S. 275, 119 S. Ct. 1239 (1999) ..................................... 31, 35

*United States v. Salinas,*
373 F.3d 161 (1st Cir. 2004) ............................................... 29, 31

*United States v. Stratton,*
649 F.2d 1066 (5th Cir. 1981).....................................................30

*United States v. Ticchiarelli,*
171 F.3d 24 (1st Cir. 1999) .........................................................16

*Welch v. United States,*
136 S. Ct. 1257 (2016)................................................................11

*Yeager v. United States,*
557 U.S. 110 (2009)....................................................................38

*Zicarelli v. Gray,*
543 F.2d 466 (3d Cir. 1976) .......................................................19

**Statutes & Other Authorities:**

U.S. Const. amend. VI ...................................................... *passim*

U.S. Const. amend. XIV ............................................................35

U.S. Const. art. II, § 2, cl. 3 ....................................................34

U.S. Const. art. III ...................................................... 29, 31, 34

U.S. Const. art. III, § 2, cl. 3 ......................................... *passim*

18 U.S.C. § 3235 .......................................................................32

28 U.S.C. § 2106 ........................................... 1, 15, 16, 40

28 U.S.C. § 2244(b)(3)(A) ..........................................................4

28 U.S.C. § 2253 ........................................................................3

28 U.S.C. § 2253(c)(2) ...............................................................5

28 U.S.C. § 2255 .....................................................................5, 8

28 U.S.C. § 2255(h) ................................................................4, 7

28 U.S.C. § 2255(h)(2)..............................................................10

1 Annals of Cong. 435 (1789).....................................................14

1 Cambridge History of The British Empire 668 (1929)..............24

1 Journals of the Continental Congress 1774-1789 (Library of Congress ed. 1904) ...............................................................................................26

I The Papers of Thomas Jefferson, 1760-1776 (Julian P. Boyd ed. 1950) ...........26

3 Joseph Story, *Commentaries on the Constitution* § 1775 (1833) .......................29

III Max Farrand, Records of the Federal Convention of 1787 (1911)....................26

4 W. LaFave, J. Israel, N. King & O. Kerr, *Criminal Procedure* § 16.1(c) (4th ed. 2015) ................................................................................................36

12 Geo. III, c. 24 (1772)....................................................................... 24, 26

14 Geo. III, c. 39 (1774)....................................................................... 25, 26

35 Henry VIII, c. 2 (1543) ...........................................................................23

Act of July 12, 1894, ch. 132, 28 Stat. 102.................................................32

Act of Mar. 2, 1793, ch. 22, § 3, 1 Stat. 334...............................................32

Act of Mar. 3, 1911, ch. 231, § 53, 36 Stat. 1101 .......................................33

Advisory Committee's Note to Habeas Corpus Rule 9, 28 U.S.C. .......................10

An Act for Trial of Murders and Felonies Committed in Several Counties, 2 & 3 Edw. 6, c. 24 (1548)....................................................................20

Brian C. Kalt, *Crossing Eight Mile: Juries of the Vicinage and County-Line Criminal Buffer Statutes*, 80 Wash. L. Rev. 271 (2005) ................................ 18, 19

Brian C. Kalt, *The Perfect Crime*.................................................... 20, 21, 28

Daniel D. Blinka, *Jefferson and Juries: The Problem of Law, Reason, and Politics in the New Republic*, 47 Am. J. Legal Hist. 35 (2005)............. 22, 23

Drew L. Kershen, *Vicinage—Part II*, 30 Okla. L. Rev. 1 (1977) ............... 27, 31, 33

Fed. R. App. P. 22(b)..................................................................................3

Fed. R. Crim. P. 18 ............................................................... 29, 33, 34

Fed. R. Crim. P. 19 ...................................................................................33

Fed. R. Crim. P. 20 ............................................................................ 33, 34

Fed. R. Crim. P. 21 ............................................................................ 33, 34

Henry G. Connor, *The Constitutional Right to a Trial by a Jury of the Vicinage*, 57 U. Pa. L. Rev. 197 (1909) .................................... 19, 23, 25, 26

Journals of the House of Burgesses of Virginia, 1766-1769
(Kennedy ed. 1906)............................................................... 24, 37

Judiciary Act of 1789, ch. 20, § 29, 1 Stat. 73 ....................................32

Letter from Benjamin Franklin to Benjamin Vaughan, March 14, 1785.................13

Magna Carta, ch. XX (1215)............................................................ 18, 19

Magna Carta, ch. XXXIX ...............................................................18

Mass. Bill of Rights, Art. XIII ......................................................25

Matthew P. Harrington, *The Legacy of the Colonial Vice-Admiralty Courts
(Part II)*, 27 J. Mar. L. & Com. 323 (1996)............................... 21, 22, 23

The Declaration of Independence para. 21 (U.S. 1776) .........................26

The Federalist No. 84 (Alexander Hamilton) (Clinton Rossiter ed., 1961) ...........27

Venue: A Legal Analysis of Where a Federal Crime May Be Tried,
Cong. Res. Serv. (Dec. 6, 2018)........................................ 17-18

William Blackstone, *Commentaries on the Laws of England* (4th ed.,
4 vols., Dublin 1771) ............................................... 13, 20, 37

William Wirt Blume, *The Place of Trial of Criminal Cases: Constitutional
Vicinage and Venue*, 43 Mich. L. Rev. 59 (1944) ....................... *passim*

NOW COMES PETITIONER, Daniel E. Carpenter, to respectfully ask this Court to vacate his unlawful conviction based on the violations of the fundamental rights under the Constitution contained in the Vicinage Clause as described by the Supreme Court in *Smith v. United States*, 143 S. Ct. 1594, 1604–06, (2023). Alternatively, if the unlawful conviction is not vacated pursuant to this Court's authority under 28 U.S.C. § 2106, then Petitioner asks for this Court to issue a Certificate of Appealability pursuant to *Smith* and schedule a briefing schedule.

## INTRODUCTION

Petitioner comes before this Court to secure a Certificate of Appealability in the event that this Court does not vacate his conviction pursuant to the violations of the Vicinage Clause as described in *Smith*. Petitioner respectfully suggests that his loss of a fundamental constitutional right is much stronger than the defendant in *Smith* as both of the Petitioner's jury verdicts were thrown out for egregious prosecutorial misconduct that continues to this day.

As Judge Selya stated in affirming the vacating of a conviction for a famous gangster:

> It is axiomatic that the government must turn square corners when it undertakes a criminal prosecution. This axiom applies regardless of whether the target of the prosecution is alleged to have engaged in the daintiest of white-collar crimes or the most heinous of underworld activities. It follows that courts must be scrupulous in holding the government to this high

standard as to sympathetic and unsympathetic defendants alike. The case before us plays out against the backdrop of these aphorisms. The first exception is for new rules "forbidding criminal punishment of certain primary conduct [or] prohibiting a certain category of punishment for a class of defendants because of their status or offense." The second is for newly announced "watershed rules of criminal procedure implicating the fundamental fairness and accuracy of the criminal proceeding." *Saffle v. Parks,* 494 U.S. 484, 495, (1990).
*Ferrara v. United States*, 456 F.3d 278, 289 (1st Cir. 2006).

In *Ring v. Arizona,* 536 U.S. 584, (2002), the Supreme Court held that a jury, not a judge, must make the findings necessary to qualify a person for punishment by death. That holding amounts to a "watershed" procedural ruling that a federal habeas court must apply when considering a constitutional challenge to a "final" death sentence-*i.e.,* a sentence that was already final on direct review when *Ring* was decided. Significantly, this Court's decision in *Abdelaziz* created a new rule of constitutional law that means that Petitioner committed no crime in Massachusetts. The *Abdelaziz* decision by Judges Lynch and Lipez actually cites Judge Lipez and Judge Lynch from Petitioner's 2007 decision so it is clearly time to vacate Petitioner's unlawful conviction:

> "When considering a motion for a new trial based on a prosecutor's closing argument, the court must determine whether the comments were improper and, if so, whether they "so poisoned the well" as to necessitate a new trial.*"*
> *United States v. Carpenter*, 494 F.3d 13, 23 (1st Cir. 2007). *United States v. Abdelaziz,* 68 F.4th 1 (1st Cir. 2023).

# I. STANDARD OF REVIEW

Under 28 U.S.C. § 2253 and Federal Rule of Appellate Procedure 22(b), as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a habeas petitioner who wishes to appeal from a final order of a district court must obtain a Certificate of Appealability (COA) for each issue he or she wishes to present to the court of appeals.

In *Slack v. McDaniel*, 529 U.S. 473, 483 (2000), the Supreme Court concluded that, "[e]xcept for substituting the word 'constitutional' for the word 'federal,'" AEDPA's COA requirement is merely "a codification of" the pre-AEDPA standard for granting a certificate of probable cause, as "announced in *Barefoot v. Estelle*," 463 U.S. 880, 894 (1983).

A Court need not be convinced of the ultimate merits before granting a COA. *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003) ("[W]e decide again that when a habeas applicant seeks permission to initiate appellate review of the dismissal of his petition, the court of appeals should limit its examination to a threshold inquiry into the underlying merit of his claims."). A claim may be debatable, and thus deserving of a COA, "even though every jurist of reason might agree, after the certificate of appealability has been granted and the case received full consideration, that petitioner will not prevail." *Miller-El*, 537 U.S. at 338.

To file what the government may argue is a second or successive motion to vacate a conviction, a petitioner must first move in the appropriate court of appeals for an order authorizing the district court to consider his "alleged" successive motion. 28 U.S.C. § 2244(b)(3)(A). Such authorization may be granted if the appellate court certifies that the second or successive motion contains a claim involving:

> (1) newly discovered evidence that, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that no reasonable fact-finder would have found the movant guilty of the offense; or

> (2) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable.

28 U.S.C. § 2255(h).

Because Petitioner's conviction may be deemed "final" by the Government, he may only rely on a "new rule" announced by the Supreme Court that applies retroactively when challenging his conviction or on a "watershed decision" or a substantive change in the elements of a crime. *See Schriro v. Summerlin*, 542 U.S. 348, 351 (2004). Petitioner has several recent Supreme Court decisions in his favor, but this particular motion is specifically pertaining to the clear Vicinage Clause violations as described in *Smith*. New substantive rules generally apply retroactively. *See id.* at 351. New substantive rules include both "decisions that narrow the scope

of a criminal statute by interpreting its terms, as well as constitutional determinations that place particular conduct or persons covered by the statute beyond the [government's] power to punish." *Id.* at 351–52, (citations and footnote omitted). Both new rules of statutory law and new rules of constitutional law apply retroactively to an initial § 2255 motion because they "necessarily carry a significant risk that a defendant stands convicted of an act that the law does not make criminal or faces a punishment that the law cannot impose upon him." *Id.* at 352, (quoting *Bousley v. United States*, 523 U.S. 614, 620 (1998)) (internal quotation marks omitted). See also e.g. *Seabrooks v. United States,* 32 F.4th 1375, 1382–83 (11th Cir. 2022).

Under 28 U.S.C. § 2253(c)(2), the Court should grant a COA if "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Slack v. McDaniel,* 529 U.S. 473, 484 (2000) (quoting *Barefoot v. Estelle*, 463 U.S. 880, 893 n.4 (1983)).

A court "should not decline the application for a COA merely because it believes the applicant will not demonstrate an entitlement to relief." *Miller-El v. Cockerell*, 537 U.S. 332, 337 (2003). The Supreme Court has emphasized, "We do not require petitioner to prove, before the issuance of a COA, that some jurists would grant the petition for habeas corpus. Indeed, a claim can be debatable even

though every jurist of reason might agree, that after the COA has been granted and the case has received full consideration, that petitioner will not prevail." *Id.* at 338.

A movant is entitled to relief "**if the judgment was rendered without jurisdiction**, or…the sentence imposed was not authorized by law or otherwise open to collateral attack, or… **there has been such a denial or infringement of the constitutional rights of the prisoner as to render the judgment vulnerable to collateral attack.**" *Id.* Application of the governing standards establishes that a COA should be issued and the appeal heard so that the relief warranted, a remand to the district court to conduct an evidentiary hearing, may be granted.

This court need not be convinced of the ultimate merits before granting a COA. *Miller-El*, 537 U.S. at 327 ("[W]e decide again that when a habeas applicant seeks permission to initiate appellate review of the dismissal of his petition, the court of appeals should limit its examination to a threshold inquiry into the underlying merit of his claims.").

As the Supreme Court stated in *Schriro*, the Vicinage Clause decision in *Smith* is clearly retroactive for Petitioner for all the reasons above, including it being a "watershed" decision because Petitioner was deprived of one of the most fundamental and ancient Constitutional rights:

> When a decision of this Court results in a "new rule," **that rule applies to all criminal cases still pending on direct review.** *Griffith v. Kentucky,* 479 U.S.

314, 328, (1987). As to convictions that are already final, however, the rule applies only in limited circumstances. New *substantive* rules generally apply retroactively. This includes decisions that narrow the scope of a criminal statute by interpreting its terms, see *Bousley v. United States,* 523 U.S. 614, 620-621, (1998), as well as constitutional determinations that place particular conduct or persons covered by the statute beyond the State's power to punish, see *Saffle v. Parks,* 494 U.S. 484, 494-495, (1990); *Teague v. Lane,* 489 U.S. 288, 311, (1989) (plurality opinion). **Such rules apply retroactively because they "necessarily carry a significant risk that a defendant stands convicted of 'an act that the law does not make criminal'" or faces a punishment that the law cannot impose upon him.** ***Bousley, supra,* at 620, (quoting *Davis v. United States,* 417 U.S. 333, 346, (1974)).**

*Schriro v. Summerlin,* 542 U.S. 348, 351–52, (2004).

The Antiterrorism and Effective Death Penalty Act (AEDPA) limited a person's ability to file "successive" habeas petitions to those that raise either (1) newly discovered evidence, or (2) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable. 28 U.S.C. § 2255(h). This limitation was meant to prevent the abuse of the writ of habeas corpus, *see Felker v. Turpin,* 518 U.S. 651, 664 (1996), by barring successive motions raising habeas claims that could have been raised in earlier motions where there was no legitimate excuse for failure to do so. *See McCleskey v. Zant,* 499 U.S. 467, 493-95 (1991). Clearly, an argument that the "Vicinage Clause" was violated could not have been raised until June of 2023 and Petitioner had several motions on direct review with the District Court.

However, not every subsequent petition is considered "second or successive".

7

"[A] subsequent petition is 'second or successive' when it raises a claim that was, or could have been, raised in an earlier petition." *James v. Walsh*, 308 F.3d 162, 167 (2d Cir. 2002). The phrase "second or successive" is not self-defining and does not refer to all habeas applications filed second or successively in time. *See Panetti v. Quarterman*, 551 U.S. 930, 943-44 (2007). Rather, it is a term of art that takes its full meaning from the Supreme Court's case law, including decisions predating the enactment of AEDPA.

When a defendant's legal claim is raised by habeas and is denied, and a subsequent Supreme Court case vindicates his claim, then he may revive his argument by way of a new 2255 motion. "[E]ven though the legal issue raised in a § 2255 motion 'was determined against (the applicant) on the merits on a prior application,' 'the applicant may (nevertheless) be entitled to a new hearing upon showing an intervening change in the law . . ..'" *Davis v. United States*, 417 U.S. 333, 342 (1974) (quoting *Sanders v. United States*, 373 U.S. 1, 17 (1963)). *See United States v. Becker*, 502 F.3d 122, 128 (2d Cir. 2007) (*Davis* held that "law of the case did not preclude a petitioner from seeking § 2255 relief based on a change in the law that occurred after his conviction was affirmed on direct appeal"). Here, Petitioner is doing a protective filing to preserve his right to argue *Smith* and that the Vicinage Clause was violated in this case.

Similarly, when there are changes in a defendant's factual circumstances that

give rise to a cognizable claim, then a defendant may raise them without running afoul of the second or successive limit. In *Panetti*, the Supreme Court concluded that the petitioner's subsequent petition was not second or successive because the claim did not ripen until after his first habeas petition was adjudicated on the merits. 551 U.S. at 942-45. The Court rejected the state's argument that a prisoner contemplating a future claim must preserve that same claim by filing it in his first habeas petition. *Id.* at 943, 946. It explained that if such an interpretation of "second or successive" were correct, "'the implications for habeas practice would be far reaching and seemingly perverse.'" *Id.* at 943 (quoting *Stewart v. Martinez-Villareal*, 523 U.S. 637, 644 (1998)).

The decision in *Panetti* has been applied broadly. *See Stewart v. United States*, 646 F.3d 856, 852 (11th Cir. 2011) ("[W]hen a claim could not have been raised in a prior habeas petition, courts have interpreted *Panetti* to permit that claim to be raised in a subsequent petition." (citing *United States v. Buenrostro*, 638 F.3d 720, 725 (9th Cir. 2011) (per curiam) ("Prisoners may file second-in-time petitions based on events that do not occur until a first petition is concluded."); *Johnson v. Wynder*, 408 Fed. Appx. 616, 619 (3d Cir. 2010) ("We see no reason to avoid applying *Panetti* in the context of other types of claims that ripen only after an initial federal habeas petition has been filed."); *United States v. Lopez*, 577 F.3d 1053, 1064 (9th Cir. 2009) ("The considerations the [Supreme] Court identified in support of its

holding are not specifically limited to *Ford* claims, and therefore must be considered in deciding whether other types of claims that do not survive a literal reading of AEDPA's gatekeeping requirements may nonetheless be addressed on the merits.").

Section 2255(h)(2) also provides that a prisoner may raise file a second motion for relief when a panel of this Court certifies that it contains "a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable." *See McCleskey*, 499 U.S. at 520 n.8 (1991) (quoting Advisory Committee's Note to Habeas Corpus Rule 9, 28 U.S.C., p. 427 ("A retroactive change in the law and newly discovered evidence are examples" of "instances in which petitioner's failure to assert a ground in a prior petition is excusable")).

The Supreme Court's construction in *Smith* is retroactive as a matter of law:

> New *substantive* rules generally apply retroactively. This includes decisions that narrow the scope of a criminal statute by interpreting its terms, see *Bousley v. United States,* 523 U.S. 614, 620-621 … (1998), as well as constitutional determinations that place particular conduct or persons covered by the statute beyond the State's power to punish, see *Saffle v. Parks,* 494 U.S. 484, 494-495 … (1990); *Teague v. Lane,* 489 U.S. 288, 311 … (1989) (plurality opinion). Such rules apply retroactively because they "necessarily carry a significant risk that a defendant stands convicted of 'an act that the law does not make criminal'" or faces a punishment that the law cannot impose upon him. *Bousley, supra,* at 620 (quoting *Davis v. United States,* 417 U.S. 333, 346 … (1974)).

*Schriro v. Summerlin*, 542 U.S. 348, 351–52 (2004). "A rule is substantive rather than procedural if it alters the range of conduct or the class of persons that the law

punishes." *Id.* at 353. "This includes decisions that narrow the scope of a criminal statute by interpreting its terms, as well as constitutional determinations that place particular conduct or persons covered by the statute beyond the State's power to punish." *Id.* at 351. *See also Welch v. United States*, 136 S. Ct. 1257, 1265 (2016) (reaffirming *Schriro*).

## II.  THE SUPREME COURT'S DECISION IN *SMITH v. UNITED STATES* REQUIRES THIS COURT TO VACATE PETITIONER'S CONVICTION FOR VIOLATIONS OF THE VICINAGE CLAUSE

The Indictment in the Boston case was clearly constitutionally defective for a number of reasons, and both jury verdicts were thrown out for egregious prosecutorial misconduct. But if there was actually no crime committed at all based on *Ciminelli*, *Percoco*, and *Kelly*, and this Court's decision in the "Varsity Blues" case of *Abdelaziz*, then Petitioner's trial in Boston also violated the Vicinage Clause of the Constitution, because there was no "crime" at all committed in the District of Massachusetts. If there was no crime committed in Massachusetts, it was a fundamental "constitutional" error to draw the jury pool twice from the City of Boston. Venue was also improper in the District of Massachusetts, but Petitioner's argument here focuses on the clear violation of the Vicinage Clause, which as a Constitutional Right is even older and more firmly established than Venue.

Furthermore, virtually all Constitutional scholars cite Benjamin Franklin's Maxim "That it is better to let 100 Guilty Persons escape rather than One Innocent Person suffer" – as the source and support for most of the "guaranteed" Constitutional protections for criminal defendants written into the Constitution and the Bill of Rights:

> That it is better 100 guilty Persons should escape, than that one innocent Person should suffer, is a Maxim that has been long & generally

approv'd, never that I know of controverted. Even the sanguinary Author of the *Thoughts* agrees to it page 163, adding well, that "the very Thought of *injured* Innocence, and much more that of *suffering* Innocence, must awaken all our tenderest and most compassionate Feelings, and at the same time raise our highest Indignation against the Instruments of it.

This principle had been most recently enunciated by Sir William Blackstone in his *Commentaries on the Laws of England* (4th ed.; 4 vols., Dublin, 1771), iv 352: "all presumptive evidence of felony should be admitted cautiously: for the law holds, that it is better that ten guilty persons escape, than that one innocent suffer."

Letter from Benjamin Franklin to Benjamin Vaughan, March 14, 1785, courtesy of The National Archives.

Respectfully, Petitioner suggests to this Court that for the past 20 years he has played the role in Boston of the "One Innocent Person" that Benjamin Franklin warned we should not let suffer. But even assuming *arguendo* that Petitioner was "guilty as sin" as the Government in Boston still suggests to this day – whatever Petitioner did or failed to do – he did in Connecticut. And this is what the Supreme Court said in June of 2023 in *Smith*, describing the history of the Vicinage Clause, which requires this Court to vacate Petitioner's conviction and forever end the Government's bogus claims of "repackaging" the dozen major constitutional violations that occurred in Petitioner's case over the past 20 years:

There is no question that the founding generation enthusiastically embraced the vicinage right and wielded it "as a political argument of the Revolution." Prior to the Revolution, Parliament enacted measures to circumvent local trials before colonial juries, most notably by authorizing trials in England for both British soldiers charged with murdering colonists and colonists accused of treason. The Continental Congress and colonial legislatures forcefully objected to trials in England before loyalist juries,

characterizing the practice as an affront to the existing "common law of England, and more especially to the great and inestimable privilege of being tried by ... peers of the vicinage." The Declaration of Independence also denounced these laws, under which, it said, British soldiers were "protect[ed] ... by a mock Trial" and colonists were "transport[ed] ... beyond the Seas to be tried for pretended offences." As States declared independence, most incorporated some form of a venue or vicinage clause in their governing documents, but none of these provisions specified a particular remedy for violations. The common-law vicinage right, both as a jury requirement and as a proxy for venue, remained prominent during debates over the ratification of the Constitution. As originally proposed, the Constitution contained only the Venue Clause, which, as noted, says nothing about jury composition. Appealing to "ancient common law," Anti-Federalists objected to this omission. Federalists responded that Congress could secure the vicinage right by statute, analogizing to common law, where "the preservation of this right [was] in the hands of Parliament." After the ratification of the Constitution, Congress yielded in part to the Anti-Federalists' argument and included a vicinage right in the Sixth Amendment. James Madison's initial draft of the Amendment required a jury "of the vicinage," 1 Annals of Cong. 435 (1789), **but Congress amended that language so that it guaranteed a jury from the State of the crime and from any smaller judicial districts that Congress chose to create.** This history tells us two important things about the way in which the Constitution dealt with the common-law vicinage right. First, the right was highly prized by the founding generation, and this right undoubtedly inspired the Venue and Vicinage Clauses. Second, although the Clauses depart in some respects from the common law—most notably by providing new specifications about the place where a crime may be tried— there is no meaningful evidence that the Constitution altered the remedy prescribed by common law for violations of the vicinage right. *Smith v. United States*, 143 S. Ct. 1594, 1604–06, (2023).

## III.   THE SUPREME COURT'S DECISION IN *SMITH* IN REGARDS TO THE VICINAGE CLAUSE REQUIRES THAT THIS COURT GRANT THIS MOTION AND VACATE PETITIONER'S CONVICTION PURSUANT TO 28 U.S.C. § 2106

The proposition that local crimes must be tried by local juries is among the bedrock principles of American criminal procedure. It ensures that **local citizens** of the Defendant's "Village"—and not the government—will decide a defendant's guilt or innocence. This principle contains two distinct conceptual strands: (1) venue, which is the location of the trial itself; and (2) vicinage, which refers to the location of the jury pool. These two concepts are often conflated in modern American law, but they both have historical roots dating back centuries, and together they emphasize the importance of venue as a defendant's individual, substantive right and as a critical check on government authority. Contrary to a certain Boston AUSA, Venue has not been discussed in this case since 2005, and the Vicinage Clause has never been discussed in the First Circuit before *Smith*. As both of Petitioner's jury verdicts were thrown out and now deemed constitutionally invalid, this Court should vacate Petitioner's conviction as a matter of law pursuant to its powers under 28 U.S.C. § 2106 which states:

> The Supreme Court or any other court of appellate jurisdiction may affirm, modify, vacate, set aside or reverse any judgment, decree, or order of a court lawfully brought before it for review, and may remand the cause and direct the entry of such appropriate judgment, decree, or order, or require such further proceedings to be had as may be just under the circumstances.

In fact, the Supreme Court used 28 U.S.C. § 2106 for its ability to summarily vacate a decision in a number of circumstances known as a "GVR":

> Title 28 U.S.C. § 2106 appears on its face to confer upon this Court a broad power to GVR: "The Supreme Court or any other court of appellate jurisdiction may ... vacate ... any judgment, decree, or order of a court lawfully brought before it for review, and may remand the cause and ... require such further proceedings to be had as may be just under the circumstances." *Lawrence on Behalf of Lawrence v. Chater*, 516 U.S. 163, 166, (1996).

> "On direct appeal, a court of appeals has broad authority to 'modify, vacate, set aside or reverse' an order of a district court, and it may direct such further action on remand 'as may be just under the circumstances.'" (quoting 28 U.S.C. § 2106)); *accord United States v. Ticchiarelli,* 171 F.3d 24, 31 (1st Cir.1999). For example, this circuit has relied on § 2106 on direct appeal to "authorize[ ] reduction to a lesser included offense where the evidence is insufficient to support an element of the offense stated'" *United States v. Arrington*, 763 F.3d 17, 25–26 (D.C. Cir. 2014).

The right to be tried in a proper venue became a flashpoint in the Revolutionary era, as the British Parliament enacted laws that provided for colonists accused of crimes to be tried thousands of miles away in England. The Founders saw these measures as serious incursions on a defendant's right to be tried in the appropriate place and by the appropriate jurors of the vicinage—rights that they viewed as inherent to a fair trial. They therefore codified those rights in the Constitution in Article III and in the Sixth Amendment. U.S. Const. art. III, § 2, cl. 3; U.S. Const. amend. VI.

The Founders conceived the Venue right as an important means of protecting the defendant from the hardships of standing trial in a foreign and unfriendly forum

without family support, access to legal services and evidence, or knowledge of the local jury pool. Combined with the related concept of Vicinage, it also serves as a critical check on government abuse: It limits the prosecutor's ability to manipulate the process by subjecting defendants to a trial in whichever locations and before whichever juries the prosecution thinks are most likely to yield a conviction.

When the government fails to prove venue at trial, acquittal is the remedy that best serves the purposes of the venue right and honors its historical importance. But in this case, a violation of the Vicinage Clause requires vacating Petitioner's conviction as a matter of law according to the unanimous Supreme Court decision in *Smith*. In *Smith* it was just the wrong "district" in Florida – but in Petitioner's case it was the wrong state as well, an even more glaring constitutional error.

### A. The Constitutional Right to Be Tried in a Proper Venue Is Foundational to the Anglo-American Legal Tradition

The right to be tried in the proper venue has a centuries-long historical pedigree. It is intertwined with the ancient principle of Vicinage—the requirement that a criminal defendant be tried before a jury hailing from the place of the crime. But the right to a jury of the vicinage actually predates the concept of Venue and is "acknowledged in the Magna Carta, which declared that 'no freeman shall be taken or imprisoned. . . unless by the lawful judgment of his peers' and that punishment would not be 'assessed but by the oath of honest men *in the neighborhood*.'" Venue:

A Legal Analysis of Where a Federal Crime May Be Tried at 21, Cong. Res. Serv. (Dec. 6, 2018), (emphasis in original) (quoting Magna Carta, XXXIX, XX).

Though the Venue and Vicinage rights are formally enshrined in separate constitutional provisions, for much of common-law history, given the limited means of travel then available, Venue and Vicinage were inextricably linked: The requirement that a jury be chosen from the area where the crime was committed (Vicinage) meant that a trial in accord with the Vicinage requirement was, in all likelihood, set in the place where the alleged crime occurred (Venue). See e.g. Brian C. Kalt, *Crossing Eight Mile: Juries of the Vicinage and County-Line Criminal Buffer Statutes*, 80 Wash. L. Rev. 271, 276 (2005) (*Crossing Eight Mile*); see also *United States* v. *Passodelis*, 615 F.2d 975, 977 n.3 (3d Cir. 1980).

The Venue and Vicinage rights took on outsized importance during the American Revolutionary period, when colonists condemned British extradition of Americans for crimes committed in the colonies. The result was an original Constitution that codified the right to venue where the crime was committed, and a Bill of Rights that further protected the rights of Vicinage. Together, these rights repudiated British abuses and stood as a critical check on the early American government.

## B. The Vicinage Clause Has Its Roots in English Common Law and The Magna Carta

In feudal England, vicinage—the geographical origin of a jury—was as much a product of necessity as of right. Under the early English jury system, jurors "decided cases based on their own knowledge, and they were therefore selected on that basis." Kalt, *Crossing Eight Mile*, *supra*, at 296. In a system in which jurors "were required, or at least presumed, to know the facts [of a case] of their own knowledge," and indeed might even investigate the facts themselves, proximity of the jurors to the place of the alleged crime was paramount. William Wirt Blume, *The Place of Trial of Criminal Cases: Constitutional Vicinage and Venue*, 43 Mich. L. Rev. 59, 60 (1944); *Zicarelli* v. *Gray*, 543 F.2d 466, 475 (3d Cir. 1976). Sir Edward Coke, writing in the early 1600s, emphasized the importance of knowing "out of what neighborhood" a jury should hail, lest the jury be ill-suited to its administrative inquest. Blume, *supra*, at 60.

While a jury selected from the place of the crime was ordinarily a matter of practical necessity, commentators have understood the Magna Carta to have "secured" the right to trial by a jury of the vicinage "against Royal interference." Henry G. Connor, *The Constitutional Right to a Trial by a Jury of the Vicinage*, 57 U. Pa. L. Rev. 197, 198 (1909). The Magna Carta decreed that punishment for crime would flow only "by the oath of trustworthy men *of the vicinity*." Magna Carta, ch. 20 (1215) (emphasis added).

The subsequent two centuries saw a gradual relaxation of the vicinage and venue requirements in English legal practice. With respect to vicinage, by the mid-1700s, the jury more closely approximated modern analogues, with jurors no longer expected to furnish their own knowledge of a matter, but instead "to obtain their knowledge only from evidence produced in open court."

While this evolution in the role of the jury might have presaged retirement of the vicinage requirement, vicinage persisted, just in broader geographical units. As Sir William Blackstone observed in 1768, while ancient law drew its juries "from the neighbourhood of the village or place where the cause of action was laid," the shift toward impartial juries meant that the jury was "now only to come *de corpore comitatus*, from the body of the county at large, and not *de vicineto,* or from the particular neighbourhood." William Blackstone, Commentaries on the Laws of England at 360.

As for venue, formalistic adherence to the requirement that a crime be tried in the place where it was committed meant that defendants could evade punishment for even heinous crimes: "it often happene[d]" that a murderer would strike his victim in one county, and "by Craft and Cautele" avoid punishment by making sure that the victim died in the next county. Kalt, *The Perfect Crime, supra,* at 675 (quoting An Act for Trial of Murders and Felonies Committed in Several Counties, 2 & 3 Edw. 6, c. 24 (1548) (Eng.)). To address these practical problems and ensure that crimes

could be properly investigated and tried, Parliament carved out certain limited exceptions to the traditional venue requirement. *Ibid.*; see Blume, *supra*, at 62–63. Despite these exceptions, traditional venue requirements persisted and applied in most circumstances. See Blume, *supra*, at 60–63.

### c. The American Revolution Underscored the Importance of the Right to Proper Venue and a Local Jury, Which the Founders Codified in the Constitution

While English legal practice tolerated certain erosions of the venue and vicinage requirements, "[i]n the rebellious American colonies, the principle of local jury trial persisted more strongly." Kalt, *The Perfect Crime*, *supra*, at 676. Indeed, as tensions flared between the colonists and Great Britain in the late 18th century, the principle of local jury trial assumed visceral importance in the colonies.

The rigging of venue and jurisdiction was a core strategy of the Crown to enhance its ability to punish colonists' violations of its laws. In the 1760s, the colonists "routinely violated the navigation acts with impunity." Matthew P. Harrington, *The Legacy of the Colonial Vice- Admiralty Courts (Part II)*, 27 J. Mar. L. & Com. 323, 332 (1996). To bolster its ability to enforce its laws, in 1764, the British Parliament created a vice-admiralty court in Halifax, Nova Scotia, and conferred upon it concurrent jurisdiction over all violations of the trade or revenue laws, regardless of where an offense occurred. Thus, "customs or naval officials

could carry a seized vessel to Halifax for trial even though the seizure occurred in a place as distant as Georgia or South Carolina." *Id.* at 334.

As a result, "many merchants faced the prospect of losing their property simply because they could not afford to defend it in such a remote place." *Ibid.* And even those defendants who endured the journey to plead their cases hundreds of miles away faced a daunting task: "Admiralty courts sat without juries, required heavy bonds to preserve claims to confiscated property, saddled the claimant with the costs of maintaining the action, and imposed an extraordinarily difficult burden of proof on the claimant seeking the return of confiscated property." Daniel D. Blinka, *Jefferson and Juries: The Problem of Law, Reason, and Politics in the New Republic*, 47 Am. J. Legal Hist. 35, 79 (2005).

The Stamp Act, enacted the following year, represented an even more brazen manipulation of jurisdiction and venue to the Crown's advantage. Parliament vastly expanded admiralty jurisdiction, which swept even more causes of action within the jurisdiction of the vice-admiralty courts. See *ibid.* It also gave the Halifax court appellate jurisdiction over trade or revenue cases brought in vice-admiralty courts located in other colonies. Blinka, *supra*, at 79; Harrington, *supra*, at 335. While certain violations of the navigation acts could also be tried to a jury in common-law court, "Crown officers began to rely almost exclusively upon the vice-admiralty," as

"colonial juries proved to be singularly uncooperative in enforcing the trade laws." Harrington, *supra*, at 336.

The Stamp Act provoked fury in the colonies and was soon repealed. In subsequent enactments in 1766 and 1767, Parliament "attempt[ed] to defuse colonial objections to the expanded jurisdiction of the Halifax vice- admiralty court" by establishing additional vice-admiralty courts in Boston, Philadelphia, and Charleston. Harrington, *supra*, at 335; Blinka, *supra*, at 79. But the colonists continued to chafe against the jurisdiction of the vice-admiralty courts, which had plainly been engineered to stack the deck in the prosecution's favor.

As discontent continued to roil the colonies, the British government reprised its tactic of channeling proceedings against colonial rebels to forums more friendly to the Crown—this time in the criminal context. In 1769, when Massachusetts citizens interfered with enforcement of the revenue laws, Parliament reacted by reviving 35 Henry VIII, c. 2 (1543). This long-disused, Tudor-era law permitted trials for treason committed outside the "realm" to be held "before such commissioners, and in such shire of the realm, as shall be assigned by the King's majesty's commission." Blume, *supra*, at 62 (quoting 35 Henry VIII, c. 2 (1543)).

The colonies immediately responded with "fierce . . . indignation." Connor, *supra,* at 208. As soon as it received notice of Parliament's action, on May 16, 1769,

the Virginia legislature resolved that all trials for crimes committed in the colonies by residents of the colonies:

> "ought of Right to be had, and conducted . . . within the said Colony . . . ; and that the seizing any Person or Persons residing in this Colony ... and sending such Person or Persons to Places beyond the Sea, to be tried, is highly derogatory of the Rights of *British* subjects; as thereby the inestimable Privilege of being tried by a Jury from the Vicinage, as well as the Liberty of summoning and producing Witnesses on such Trial, will be taken away from the Party accused."

> Journals of the House of Burgesses of Virginia, 1766-1769, at 214 (Kennedy ed., 1906).

Other American colonies promptly approved Virginia's resolution. Blume, *supra*, at 65; 1 Cambridge History of The British Empire 668 (1929). On May 17, 1769, the day after issuing its resolution, the Virginia Legislature sent an address to the King, stating:

> [W]e cannot, without Horror, think of the new, unusual, and permit us, with all Humility, to add, unconstitutional and illegal Mode, recommended to your Majesty, of seizing and carrying beyond Sea, the Inhabitants of America, suspected of any Crime; and of trying such Persons in any other Manner than by the ancient and long established Course of Proceeding . . . .

> Journals of the House of Burgesses of Virginia, 1766-1769, at 215–16 (Kennedy ed. 1906).

Parliament was unmoved. In succeeding years, it passed additional acts permitting the transport of Colonists overseas for trial, indicating the royal government's continued suspicion that American colonial courts would not enforce its criminal laws to its satisfaction. See 12 Geo. III, c. 24 (1772) (allowing persons charged with destroying the King's dock yards, magazines, ships, ammunition, and

24

stores "in any place out of [the King's] realm," to be indicted and tried "in any shire or county within this realm" or "where such offense shall have been actually committed"); 14 Geo. III, c. 39 (1774) (**permitting persons accused of murder or other capital offenses in Massachusetts Bay to be tried in England or an adjoining province**).

The Colonists continued to protest the British assault on the right to be tried in the proper venue before a local jury—a right that they understood to be **"one of the greatest securities of life, liberty and happiness," Mass. Bill of Rights, Art. XIII, "the slightest[] surrender [of which] involved them in ruin and made them slaves to the King and Parliament,"** Connor, *supra* at 209; see also *id.* at 208 (citing North Carolina's resolution "[t]hat trial by juries of the vicinity is the only lawful inquest that can pass upon the life of a British subject . . . a right handed down to us from the earliest ages, confirmed and sanctified by Magna Carta itself"; and South Carolinian William H. Drayton's protest against the 1774 Act; and the Virginia legislature's declaration that **"the cause of Massachusetts Bay [was] the cause of all"**).

In its October 1774 Address to the People of Great Britain, the Continental Congress stated:

> In all these colonies, justice is regularly and impartially administered and yet, by construction of some and the direction of other acts of Parliament, offenders are to be taken by force, together with all such persons as may be pointed out as witnesses and carried to England, there to be tried in a distant

land by a jury of strangers and subject to all the disadvantages that result from want of friends and of wit- nesses and want of money.

Connor, *supra*, at 208. Shortly thereafter, the First Continental Congress resolved that the colonies "[were] entitled to the common law of England, *and more especially to the great and inestimable privilege of being tried by their peers of the vicinage.*" Blume, *supra*, at 65. The Continental Congress specifically enumerated 12 Geo. III, c. 24 (1772) and 14 Geo. III, c. 39 (1774), discussed above, among the "infringements and violations of the rights of the colonists," the repeal of which "is essentially necessary, in order to restore harmony between Great-Britain and the American colonies." I Journals of the Continental Congress 1774-1789 (Library of Congress ed. 1904).

Likewise, Thomas Jefferson, in the first draft and the final text of the Declaration of Independence, specifically cited the "transport[] [of colonists] beyond Seas to be tried for pretended offences" as one of the colonies' 27 grievances. I The Papers of Thomas Jefferson, 1760-1776, at 243-247 (Julian P. Boyd ed. 1950); see The Declaration of Independence para. 21 (U.S. 1776).

From the beginning, proposals for the federal Constitution likewise expressly protected a criminal defendant's right to be tried in a proper venue. The Pinckney, Hamilton, New Jersey, and Patterson Plans all featured venue provisions. See III Max Farrand, Records of the Federal Convention of 1787, at 600, 615–16, 626 (1911) ("All Criminal offenses, (except in cases of impeachment), shall be tried in

the State where they shall be committed . . . ."). Unsurprisingly given the historical context and the prominence of the venue grievance in the Declaration of Independence itself, "little debate was engendered by this venue proposal at the Constitutional Convention." Kershen, *Vicinage, supra*, at 808. Article III, section 2, clause 3 of the U.S. Constitution thus enshrines constitutional limitations on venue. See The Federalist No. 84, at 510-11 (Alexander Hamilton) (Clinton Rossiter ed., 1961) (recognizing Article III's venue clause as one of "various provisions in favor of particular privileges and rights" in the Constitution that adopts and "equally secure[s]" those rights under common law). The state ratification debates ultimately led the first Congress to adopt the Bill of Rights, including the Sixth Amendment, which expressly codifies the right to a local jury.

While the rights to proper venue and local jury are thus enshrined in separate constitutional provisions, there is no question that the Founders saw the two rights as closely related. Underlying the constitutional history was the general assumption that vicinage would follow venue and vice versa—*i.e.*, if venue was set, jurors would be chosen from the surrounding area, and if the vicinage was based on a particular geographical area, then the trial would be held within that same area. Kershen, *Vicinage, supra*, at 830–31. Put differently, "[b]y insisting on a right to a jury of the vicinage the colonists hoped to escape the hardship and danger of standing trial in some distant colony or in England." Blume, *supra*, at 65.

27

Manipulation of criminal venue by the Crown was precisely what colonists had so vigorously protested in the years preceding the Revolution. It was therefore imperative that the Sixth Amendment divest Congress of any power to assign criminal venue after the fact—and, by extension, to divest prosecutors of any ability to pressure Congress for a more convenient venue. "[A]lthough free to alter and revise the size of judicial districts," Congress could not be allowed to "constitute or reconstitute a district to affect a criminal case after commission of the alleged offense." *Ibid.* Prosecutors bringing charges are bound on the subject of venue by legislation enacted before a crime's commission. "If 'previous' just means previous to the trial rather than previous to the crime, then the Previous Ascertainment Clause would be rendered almost meaningless." Kalt, *The Perfect Crime, supra*, at 682.

As discussed above, concerns regarding the venue and vicinage rights were a hallmark of the American Revolution, leading the Founders to twice codify them in the Constitution. From the colonies' declarations and state constitutions to the adoption of the Sixth Amendment, the history makes clear that the Founders repeatedly sought (and fought) to prevent government abuse and manipulation of venue.

### D. Post-Founding Jurisprudence Has Embraced and Reinforced the Vicinage Clause

So fundamental is the right to proper Venue and Vicinage—and so unthinkable its breach—that Justice Story, writing in 1833, postulated, "There is little danger, indeed, that congress would ever exert their power in such an oppressive, and unjustifiable a manner" as to require that a defendant be "dragged to a trial in some distant state." 3 Joseph Story, *Commentaries on the Constitution* § 1775 (1833). Yet despite this presumed impossibility (after all it did happen to Petitioner), the Founders, by including Article III's Venue provision, and the Vicinage Clause, sought to "leave as little as possible to mere discretion"— especially when the "security of the citizen" was at stake. *Ibid.* See also this Court's decision in *Salinas* cited by the Third Circuit in *Auernheimer*:

> The importance of this right is emphasized by the fact that it is mentioned not once, but twice, in the text of the Constitution. *See* U.S. Const. art. III, § 2, cl. 3 ("The Trial of all Crimes ... shall be held in the State where the said Crimes shall have been committed ...."); *id.* amend. VI (**requiring trial of a criminal case "by an impartial jury of the State and district wherein the crime shall have been committed"). Congress has further entrenched these norms by an explicit directive that limits a criminal prosecution to "a district in which the offense was committed." Fed.R.Crim.P. 18. This rule "echoes the constitutional commands."** *United States v. Cabrales,* **524 U.S. 1, 6, (1998). The result is a safety net, which ensures that a criminal defendant cannot be tried in a distant, remote, or unfriendly forum solely at the prosecutor's whim.** Seen in this light, it is readily apparent that venue requirements promote both fairness and public confidence in the criminal justice system.
>
> *United States v. Salinas*, 373 F.3d 161, 164 (1st Cir. 2004)

This is what the Third Circuit had to say about Venue and the Vicinage

Clause in 2016 citing this Court's decision in Salinas:

> The Supreme Court has never held that improper venue is subject to
> harmless error review. The Second Circuit has cast doubt on whether the
> district court's application of harmless error review remains good law.
> *See United States v. Brennan,* 183 F.3d 139, 149 (2d Cir.1999) (holding that
> trial in Brooklyn, New York, where venue was improper, was not harmless
> when the defendant timely objected to venue, even though venue would
> have been proper in Manhattan, New York). Nonetheless, even assuming
> that defective venue could be amenable to harmless error review, the
> venue error here clearly affected Auernheimer's substantial rights. . The
> venue error in this case is not harmless because there was no evidence that
> any of the essential conduct elements occurred in New Jersey. If
> Auernheimer's jury had been properly instructed on venue, it could not have
> returned a guilty verdict; the verdict rendered in *this* trial would have been
> different. (failing to try defendant in district where crime was allegedly
> committed infringed the defendant's substantial rights); *see also United
> States v. Glenn,* 828 F.2d 855, 860 (1st Cir.1987) (same); *United States v.
> Stratton,* 649 F.2d 1066, 1076 n. 15 (5th Cir.1981) ("A defendant's interest
> in being tried only in a district where venue properly lay clearly constitutes a
> substantial right." (quotation marks omitted)).

> The Supreme Court has repeatedly made clear that the constitutional
> limitations on venue are extraordinarily important. "[Q]uestions of venue are
> more than matters of mere procedure. They raise deep issues of public policy
> in the light of which legislation must be construed." *Travis v. United
> States,* 364 U.S. 631, 634, (1961) (quotation marks omitted). "The provision
> for trial in the vicinity of the crime is a safeguard against the unfairness and
> hardship involved when an accused is prosecuted in a remote place." *United
> States v. Cores,* 356 U.S. 405, 407 (1958); *accord United States v.
> Passodelis,* 615 F.2d 975, 977 (3d Cir.1980). The Founders were so
> concerned with the location of a criminal trial that they placed the
> venue requirement, which is "principally a protection for the defendant,"
> *Cabrales,* 524 U.S. at 9, 118 S.Ct. 1772, in the Constitution in two places.
> *See* U.S. Const. art. III, § 2, cl. 3 and amend. VI.
> They did so for good reason. A defendant who has been convicted "**in a
> distant, remote, or unfriendly forum solely at the prosecutor's whim,**"

*United States v. Salinas,* 373 F.3d 161, 164 (1st Cir.2004), has had his substantial rights compromised. Auernheimer was hauled over a thousand miles from Fayetteville, Arkansas to New Jersey. Certainly if he had directed his criminal activity toward New Jersey to the extent that either he or his co-conspirator committed an act in furtherance of their conspiracy there, or performed one of the essential conduct elements of the charged offenses there, he would have no grounds to complain about his uprooting. But that was not what was alleged or what happened. While we are not prepared today to hold that an error of venue never could be harmless, we do not need to because the improper venue here—far from where he performed any of his allegedly criminal acts—denied Auernheimer's substantial right to be tried in the place where his alleged crime was committed. Venue issues are animated in part by the "danger of allowing the [G]overnment to choose its forum free from any external constraints." *Salinas,* 373 F.3d at 169–70 (citing *Travis,* 364 U.S. at 634, 81 S.Ct. 358). The ever-increasing ubiquity of the Internet only amplifies this concern. As we progress technologically, we must remain mindful that cybercrimes do not happen in some metaphysical location that justifies disregarding constitutional limits on venue. People and computers still exist in identifiable places in the physical world. When people commit crimes, we have the ability and obligation to ensure that they do not stand to account for those crimes in forums in which they performed no "essential conduct element" of the crimes charged. *Rodriguez–Moreno*, 526 U.S. at 280, 119 S.Ct. 1239.

*United States v. Auernheimer,* 748 F.3d 525, 539–41 (3d Cir. 2014).

In the years after the Founding, Congress fortified the constitutional venue right. For the first eighty-nine years of the constitutional republic, the Venue right laid down in Article III assured defendants that federal crimes would be tried in the place of their commission. Drew L. Kershen, *Vicinage—Part II,* 30 Okla. L. Rev. 1, 12 (1977) (*Vicinage II*) (noting "legislative silence with respect to criminal Venue prior to 1878"). Because this provision required only that trial occur "in the *State*

where the said Crimes shall have been committed," U.S. Const. Art. III, § 2, cl. 3 (emphasis added), there was uncertainty about which judicial district within a multi-district state provided the proper venue. Near the turn of the century, Congress relieved some of this uncertainty by assigning criminal proceedings to **the district of an alleged offense's commission**. See, *e.g.*, Act of July 12, 1894, ch. 132, 28 Stat. 102. In addition to *Smith*, this fact clearly weighs in favor of vacating Petitioner's conviction.

Moreover, in capital cases, Congress decreed that "the trial shall be had in the county where the offense was committed," so long as could be done "without great inconvenience." Judiciary Act of 1789, ch. 20, § 29, 1 Stat. 73, 88. This **requirement remains to this day**. See 18 U.S.C. § 3235. In 1793, Congress also authorized the circuit courts to hear special sessions for criminal cases "at any convenient place in the district, nearer to the place where the offences may be said to be committed, than the place or places, appointed by law for the ordinary session." Act of Mar. 2, 1793, ch. 22, § 3, 1 Stat. 334. the century, Congress relieved some of this uncertainty by assigning criminal proceedings to the district of an alleged offense's commission. See, *e.g.*, Act of July 12, 1894, ch. 132, 28 Stat. 102. Once again this clearly weighs in Petitioner's favor.

Nonetheless, confusion persisted, and in 1910, Congress convened a Special Joint Committee on the Revision of Law to clarify the conflicting rules that had

developed. Upon the Committee's recommendation, Congress enacted Section 53 of the Judicial Code of 1911, establishing uniform criminal venue as proper in the district *and* division of a crime's commission. Act of Mar. 3, 1911, ch. 231, § 53, 36 Stat. 1101. That, however, does not cure the Vicinage Clause problems in *Smith* or this case.

Upon the promulgation of the Federal Rules of Criminal Procedure in 1946, criminal venue was governed by Rules 18 through 21. See Kershen, *Vicinage II*, *supra*, at 16. Rule 18 borrowed and restated the command of Section 53 of the Judicial Code of 1911, that trial be held in both the district *and* division of the alleged crime's commission. See *ibid.* Rules 19, 20, and 21 provided for departures from this district-and-division requirement when transferring between divisions in the same district (Rule 19); when the defendant preferred to be tried in the district of his arrest, if the indictment was pending in a different district (Rule 20); or when the venue compelled by Rule 18 posed too great a risk of prejudice to the defendant, and a new venue was "in the interest of justice" (Rule 21). See *id.* at 16–17.

Importantly, each of the Rule 18 exceptions described in Rules 19, 20, and 21 could be invoked only upon the *defendant's* motion. As the Notes of the 1944 Advisory Committee make clear, this was in keeping with the venue requirements protected by the Constitution. Rules 18 through 21, the Notes explain, were drafted "[w]ithin the framework of the . . . constitutional provisions" on venue contained in

Article III and the Sixth Amendment. Fed. R. Crim. P. 18, advisory committee's note to 1944 enactment. With an eye toward the purposes undergirding these constitutional requirements, the venue Rules sought to "reliev[e] [a defendant] of whatever hardship may be involved" in defending against prosecution in a distant venue. Fed. R. Crim. P. 20, advisory committee's note to 1944 enactment. And waiver of Rule 18's default venue requirement belonged exclusively to the defendant, as the Rules "[did] not extend the same right [of transfer] to the prosecution." Fed. R. Crim. P. 21, advisory committee's note to 1944 enactment. These Rules make clear that proper venue is a matter of right for the defendant, secure from prosecutorial manipulation.

Revisions to the Rules on venue were made in the 1960s, 1970s, 1980s, and 2000s. These were, in some instances, purely technical or stylistic. But even when revisory committees made substantive changes to the Rules, these amendments were careful to "not offend the venue or vicinage provisions of the Constitution," Fed. R. Crim. P. 18, advisory committee's note to 1979 amendment, and paid due regard to the "convenience of the parties and witnesses and the interests of justice." Fed. R. Crim. P. 21, advisory committee's note to 2010 amendment.

In parallel with these legislative enactments, the courts over the years have acknowledged the historical underpinnings of the constitutional right to be tried in a proper venue. The Founders drafted Article II, section 2, clause 3, fully "[a]ware of

the unfairness and hardship to which trial in an environment alien to the accused exposes him," and further "underscore[d] the importance of this safeguard" in the Sixth Amendment. *United States* v. *Johnson*, 323 U.S. 273, 275 (1944); see also *United States* v. *Cabrales*, 524 U.S. 1, 6 (1998) ("Proper venue in criminal proceedings was a matter of concern to the Nation's founders"); *United States* v. *Rodriguez-Moreno*, 526 U.S. 275, 279 (1999) (instructing courts to operationalize the venue requirement by "discern[ing] the location of the commission of the criminal acts"). In light of this history, this Court has repeatedly confirmed that "[q]uestions of venue in criminal cases . . . are not merely matters of formal legal procedure," but rather are issues that "touch closely the fair administration of criminal justice and public confidence in it, on which it ultimately rests." *Johnson*, 323 U.S. at 276; see also *Travis* v. *United States*, 364 U.S. 631, 634 (1961).

Numerous federal courts of appeals have similarly remarked upon the constitutional venue right's historical importance. See, *e.g.*, *United States* v. *Coplan*, 703 F.3d 46, 76–77 (2d Cir. 2012); *United States* v. *Medina-Ramos*, 834 F.2d 874, 875–76 (10th Cir. 1987); *United States* v. *Morgan*, 393 F.3d 192, 195 (D.C. Cir. 2004); see also *United States* VI, has not been incorporated against the states by the Fourteenth Amendment. But this should not be understood as the Court dis- claiming that requirement as "fundamental to the American scheme of justice," *Ramos* v. *Louisiana*, 140 S. Ct. 1390, 1397 (2020) (quoting *Duncan* v. *Louisiana*, 391 U.S.

145, 148–50 (1968)). Indeed, Founding-era concerns animating the Sixth Amendment's vicinage provision teach quite the opposite. See pp. 6–15, *supra*. Regardless, the standard practice across the states is to set venue in the political subdivision or state judicial district in which the crime was commit- ted. See 4 W. LaFave, J. Israel, N. King & O. Kerr, *Criminal Procedure* § 16.1(c) (4th ed. 2015). v. *Romans*, 823 F.3d 299, 325 (5th Cir. 2016) (Costa, J., concurring specially) (observing that the venue right "was important enough to the Founders that it— rather than the right to confront witnesses, or the right against self-incrimination, or even the right to due process—along with the related right to trial by jury are the only rules of criminal procedure included in both the original Constitution and Bill of Rights"). And as the Third Circuit has put it, "[t]hough our nation has changed in ways which it is difficult to imagine that the Framers of the Constitution could have foreseen, the rights of criminal defendants which they sought to protect in the venue provisions of the Constitution are neither outdated nor outmoded." *Passodelis*, 615 F.2d at 976.

### E. Vacating an Unlawful Conviction Vindicates the Historical Purposes of the Right to be Tried by a Jury from the Proper Vicinage

Venue and Vicinage have been integral components of the American judicial system since before the Founding. The Federal Constitution and Bill of Rights, as well as numerous state constitutions and the Federal Rules of Criminal Procedure,

codify robust protections for a criminal defendant's right to be tried in a proper Venue and now in the proper Vicinage after *Smith*.

Given the importance of Venue and the Vicinage Clause right to the nation's Founders, the Founders would have expected the right to be guaranteed through meaningful remedies. See *Marbury* v. *Madison*, 5 U. S. (1 Cranch) 137, 163 (1803) ("Where there is a legal right, there is also a legal remedy by suit, or action at law, whenever that right is invaded.") (citing 3 William Blackstone, Commentaries *23).

The Founders enshrined the Vicinage right in the Constitution and the Bill of Rights as a direct response to the English government's threats to try rebels and dissidents in distant fora. See pp. 8–14, *supra*. They understood the Vicinage right not only as protecting criminal defendants from the "unfairness and hardship" of being tried in a foreign location, *United States* v. *Johnson*, 323 U.S. 273, 275 (1944), but also as part of the "important *substantive* protections against government abuse," *United States* v. *Palma-Ruedas*, 121 F.3d 841, 862 (3d Cir. 1997). The Founders sought to prevent the government from manipulating venue and vicinage at the expense of the criminal defendant's right to a fair trial.

Multiple trials as in this case, magnify the hardship on individual defendants. The Founders explained the "misery" of standing trial in a distant land, far from family, friends, and familiar legal counsel. Journals of the House of Burgesses of Virginia, 1766-1769, at 215-16 (Kennedy ed. 1906). They also sought to prevent the

expense of trial with foreign legal counsel, an expense that would multiply with every new venue. These burdens only increase with re-trials. The prospect of being subjected to the hardships of yet another trial is cold comfort to a defendant who has successfully shown that the prosecution has failed to carry its burden of proving venue or in this case the clear violation of the Vicinage Clause.

In other words, it is *the government* that decides where to indict a criminal case. If, after choosing its venue, the government fails to gather evidence sufficient to demonstrate the selection of venue was proper, that failing lies at the feet of the government alone.

From its own failure, the government should not be allowed "another opportunity to supply evidence which it failed to muster in the first proceeding." *United States* v. *DiFrancesco*, 449 U.S. 117, 128 (1980) (simplified). Nor should the defendant suffer additional "embarrassment, expense and ordeal . . . in a continuing state of anxiety and insecurity, as well as [the] enhanc[ed] . . . possibility that even though innocent he may be found guilty." *Yeager* v. *United States*, 557 U.S. 110, 117–18 (2009) (quoting *Green* v. *United States*, 335 U.S. 184, 187–88 (1957)). The defendant has no part to play in that failure and often (as in this case) affirmatively objected to the government's venue selection on constitutional grounds.

The Founders considered the right to a proper venue and a jury of the proper vicinage to be fundamental. Rather than denigrate the significant protection that the

Founders provided for this right, this Court should grant this Motion and vacate Petitioner's conviction for failure to have a jury from the proper vicinage, as provided by Supreme Court's decision in *Smith* and as guaranteed by the Vicinage Clause in the Bill of Rights.

## IV.  PRAYER FOR RELIEF

Petitioner Carpenter respectfully requests that this Court vacate Petitioner's unlawful conviction pursuant to its powers under 28 U.S.C. § 2106 for the violations of the ancient and fundamental Constitutional right of the Vicinage Clause as expressed by the Supreme Court in *Smith v. United States*, 143 S. Ct. 1594, 1604–06, (2023). Or, in the alternative, this Court should grant Petitioner's Application for a Certificate of Appealability, for the reasons above, and set a briefing schedule.


Respectfully Submitted,

/s/ Daniel E. Carpenter
Daniel E. Carpenter
Petitioner *pro se*
18 Pond Side Lane
West Simsbury, CT 06092
860-573-7770

# CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(g), I hereby certify that this document complies with the type-volume limitations set forth in Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 10,232 words.

I further certify that this document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in a 14-point Times New Roman font.

Dated: June 12, 2024

/s/ Daniel E. Carpenter
Daniel E. Carpenter



ORIGIN ID:LRBA (212) 345-9675
MAILROOM
CB EMAS PRESS
18 EAST 48TH ST FLS

NEW YORK, NY 10016
UNITED STATES US

SHIP DATE: 28JUN24
ACTWGT: 5.00 LB
CAD: 281138842/WSXI2900

BILL SENDER

TO RICHARD CUSHING DONOVAN
UNITED STATES COURT OF APPEALS FIR
1 COURTHOUSE WAY
SUITE 2500
BOSTON MA 02210

(212) 345-6800

**FedEx**
Express

**E**

MON - 01 JUL 10:30A
PRIORITY OVERNIGHT

2764 7889 4171

02210
MA-US BOS

K4 BVYA